IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KEVIN STEVENS, | § | |
| | § | No. 298, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No:   2212008180 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |
| | § | |

Submitted: May 14, 2025
Decided:    August 11, 2025

Before **VALIHURA**, **TRAYNOR**, and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court of the State of Delaware.  **AFFIRMED.**

Robert M. Goff, Esquire, Elliot M. Margules, Esquire (*argued*), OFFICE OF THE PUBLIC DEFENDER, Wilmington, Delaware, *for Appellant Kevin Stevens*.

Carolyn S. Hake, Esquire (*argued*), DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

The defendant was tried and convicted in the Superior Court for driving a motor vehicle while under the influence of intoxicating drugs and driving with a suspended license. In this appeal, he argues—as he did in the Superior Court—that the court erroneously admitted the State's toxicology evidence, which was derived from two blood tests showing the presence of intoxicating drugs in the defendant's blood when he was arrested. More specifically, the defendant contends that the State did not lay a sufficient foundation for the challenged evidence because it did not first introduce documents showing that the machines from which the blood-test results were derived were calibrated and in good working order. By allowing the results into evidence, the trial court, so the defendant argues, abused its discretion. He asks us to reverse his conviction.

In this opinion, we decline the defendant's invitation to adopt a bright-line rule requiring the introduction of calibration records before blood-intoxication evidence is offered by expert witnesses familiar with the working order of the machines they have used to test a defendant's blood. And for all the reasons given below, we conclude that the Superior Court did not abuse its discretion when it overruled the defendant's objections to the challenged evidence. Thus, we affirm the defendant's convictions.

2

I

A

On the evening of December 18, 2022, Alexander Batt was sitting in his car in the parking lot at Branmar Plaza in Wilmington when he witnessed a white pickup truck driving erratically. Batt noticed the truck after it "almost hit"[1] his car and then ran into another parked car with enough force to cause the car to move and damage its bumper.[2]

Batt followed the truck. He observed the truck stop at a green light at an intersection, and in the truck's side mirrors, he saw the driver, later identified as Kevin Stevens, hunched over the wheel. When the light turned red, the truck proceeded through the intersection, narrowly avoiding another car. Batt continued to follow Stevens's truck, which then turned into the Graylyn Shopping Center on Marsh Road. Stevens parked the truck across two open parking spots near the Rite Aid pharmacy in the shopping center and remained slumped over for 20-30 seconds before he exited the truck and stumbled into the Rite Aid. Batt followed Stevens into the Rite Aid, where he observed him slumped over and asking where he could find the dog food. Stevens then fell over, and Batt asked the store manager to call the police.

---

[1] App. to Opening Br. at A33.
[2] A visual inspection of the truck later conducted by police, however, revealed no obvious signs of damage.

3

Trooper Sean Setting of the Delaware State Police responded to the call from the Rite Aid. Batt directed Setting to Stevens and told Setting what he had seen before arriving at the Rite Aid. Setting asked Stevens if he had consumed any alcohol or drugs, and Stevens said that he had not. Setting conducted horizontal gaze nystagmus and vertical gaze nystagmus tests,[3] but observed none of the signs indicating intoxication in either test, leading him to conclude that Stevens's condition was "not alcohol related."[4] Setting attempted to administer other field sobriety tests, but was unable to do. According to Setting, Stevens "seem[ed] like he fell asleep a few times[,]" was "slouched over[,]" and was "almost not coherent[.]"[5] Setting arrested Stevens for suspicion of driving under the influence of drugs.

After taking Stevens to the police station, Setting obtained a warrant to collect a sample of Stevens's blood. The blood sample was turned over to the Delaware Division of Forensic Services, and chemical testing of Stevens's blood revealed the presence of flubromazepam, which is a benzodiazepine derivative,[6] and fentanyl.[7] Stevens was charged with driving a vehicle under the influence of drugs under 21

---

[3] Nystagmus tests are standardized field sobriety tests conducted by asking the subject to focus on an object such as a pen or a light, then moving the object while looking for signs of involuntary eyeball movement—nystagmus—indicative of intoxication. *See generally State v. Ruthardt*, 680 A.2d 349, 352–53 (Del. Super. Ct. 1996) (describing the horizontal gaze nystagmus test).

[4] App. to Opening Br. at A87.

[5] *Id.* at A88.

[6] *See id.* at A181–82, A291.

[7] *Id.* at A291.

*Del. C.* § 4177 as well as driving with a suspended license under 21 *Del. C.* § 2756(a).  A jury trial was held in March 2024.

B

Stevens's trial strategy was twofold.  As one part of his defense, he took the stand to present his own account of the night of December 18, 2022.  He testified that he was in "a bad state of mind"[8] that evening because he had recently separated from his girlfriend and "just went out to get the dog some treats."[9]  Stevens testified further that he had left the Acme because the prices were too high and denied hitting anything in the parking lot with his truck.  He claimed that he parked his truck sideways at the Rite Aid because he was in a hurry and denied that he had fallen over inside the store.  Stevens told the jury that he thought Setting was repeatedly asking him to do field sobriety tests because "he was trying [to] get me to mess up."[10]  He added that he would have been unable to complete the tests because he was wearing steel-toed boots and had recently broken his kneecap. Stevens characterized his demeanor in the Rite Aid as "just hanging my head down like shaking it"[11] in response to Setting's repeated requests that he take field sobriety tests.

---

[8] *Id.* at A217–18.
[9] *Id.* at A218.
[10] *Id.* at A223.
[11] *Id.* at A225.

Of greater moment in this appeal, Stevens's defense also took aim at the admissibility of the State's toxicology evidence. Stevens's blood had been first tested using an enzyme-linked immunosorbent assay ("ELISA"), a preliminary test, the results of which are subject to confirmation. The ELISA results indicated the presence of a benzodiazepine and fentanyl in Stevens's blood sample. The ELISA results were confirmed using a liquid chromatograph tandem mass spectrometer ("LC-MS/MS"). The State called numerous witnesses from the Division of Forensic Services to establish the chain-of-custody of Stevens's blood sample and to provide foundation testimony to introduce the preliminary ELISA results and the LC-MS/MS results confirming the presence of a benzodiazepine, in this case flubromazepam, and fentanyl in Stevens's blood sample.

Grant Fehnel, an analytical chemist at the Division of Forensic services, testified that he had performed the preliminary ELISA test on Stevens's blood sample. He explained that although the machine used for ELISA testing does not undergo tests to ensure that it is calibrated before every sample is run, there are "quality control samples" run during the testing of live samples to ensure accuracy.[12] He further explained that the machine produces raw data during testing that may be used to verify the accuracy of the test results. During Fehnel's testimony, Stevens objected to the introduction of the State's toxicology evidence. He argued that the

_____
[12] *Id.* at A142–43.

State had failed to provide sufficient foundation that the equipment used by the Division of Forensic Services had been properly calibrated and was in working order before and after it was used to analyze Stevens's blood sample.[13] The trial judge overruled Stevens's objection because he had not made a specific discovery request for the bench notes showing that the machines were properly calibrated and had failed to "raise[] the specter that this was anything other than ordinary, regular tests . . . ."[14]

Three of the State's witnesses testified about the LC-MS/MS results. One witness, Matthew Fox, an analytical chemist who conducted a test on Stevens's blood using an LC-MS/MS, testified that the machine has a "daily calibration requirement."[15] He added that the machine was calibrated the day that he conducted the test of Stevens's blood but that he did not have the documentation produced by any calibration tests with him in the courtroom. He testified that the test he had conducted confirmed the presence of fentanyl in the sample. Another analytical chemist, Shronda Ellis, who had been tasked with conducting an LC-MS/MS test to confirm the presence of benzodiazepine in the sample, testified that although the lab's LC-MS/MS machines are not necessarily calibrated every day, they are cleaned and a "neat" sample is run to ensure that the chemist can see all of the peaks that he

---

[13] *Id.* at A151–53 (objecting to testimony concerning ELISA results).
[14] *Id.* at A154.
[15] *Id.* at A173–74.

or she is supposed to see in the machine's output before an actual sample is run.[16]
Although Ellis had documentation showing the results of the "neat" sample with her
in the courtroom on the day of trial, it was not introduced into evidence. The LC-
MS/MS results confirmed that a benzodiazepine—specifically flubromazepam—
was present in Stevens's blood sample. Lastly, Jessica Smith, Delaware's Chief
Forensic Toxicologist, whose job includes certification of final toxicology reports,
confirmed that LC-MS/MS machines undergo daily maintenance. This includes
"running calibrators."[17] She added that the lab's acceptance criteria had been
followed in this case and that she had the raw data showing that this was the case in
the courtroom with her. This documentation, too, was not introduced into evidence.

Stevens raised the same objection—that the experts' reliability opinions were
inadequate and thus the toxicology evidence was inadmissible for lack of
foundation—during the testimony of each of the three witnesses that testified about
the reliability of the LC-MS/MS results, and the trial judge overruled each objection
for the same reasons.[18]

---

[16] *Id.* at A184.
[17] *Id.* at A201.
[18] *Id.* at A167, A180, A194.

C

Stevens was convicted of both driving under the influence of drugs and driving with a suspended license.  Stevens moved for a new trial, augmenting the argument that he had made at trial and arguing that the State's foundation for the admission of the blood intoxication results was insufficient under this Court's decision in *McConnell v. State*, an opinion that addressed the admissibility of intoxilyzer evidence in driving-under-the-influence-of-alcohol cases.[19]  *McConnell* requires that the State lay foundation showing that the machine that generated the result in question was "operating accurately before and after testing the breath of the defendant on trial."[20]  This requirement, according to defense counsel, applies with equal force to the LC-MS/MS results introduced in this case.

The Superior Court denied Stevens's motion.  The court noted again that it was unclear whether defense counsel had requested the bench notes showing that the machines were calibrated and in working order in discovery under Superior Court Criminal Rule 16, but if he had and the bench notes had not been provided, presumably any discovery dispute could have been resolved before trial.[21]  The court also noted that numerous witnesses from the Division of Forensic Services had testified that the machines were in working order and frequently calibrated, and

---

[19] 639 A.2d 74, 1994 WL 43751 (Del. Feb. 3, 1994) (TABLE).
[20] *Id.* at *1.
[21] Opening Br. Ex. B at 2.

9

when one witness offered to provide defense counsel with bench notes with this information at trial, defense counsel demurred. Lastly, the court wrote that *McConnell* was of no help to Stevens's argument because, while that case requires that the State show that an intoxilyzer machine was operating accurately before and after it was used to test the defendant's breath, it also states that "[i]n the absence of evidence to the contrary, there is a presumption that the State Chemist acted carefully and in a prudent manner."[22]

Because this was his fourth DUI offense, Stevens was sentenced to two years of incarceration, suspended after six months for probation. On appeal, Stevens argues that the trial judge erred by permitting the State to introduce the results of the confirmatory LC-MS/MS tests without proper foundation.[23]

## II

Stevens properly preserved his objection to the introduction of the State's toxicology evidence at trial. We review a trial court's evidentiary rulings for abuse of discretion.[24] "An abuse of discretion occurs when a court has exceeded the

---

[22] *Id.* at 3 (quoting *McConnell*, 1994 WL 43751, at *1).
[23] Stevens's trial counsel objected to testimony concerning both the ELISA and LC-MS/MS results. Because Stevens's appeal addresses only the LC-MS/MS results, we focus our analysis accordingly. *See* Supr. Ct. R. 14(b)(vi)(A)(3).
[24] *McGuinness v. State*, 312 A.3d 1156, 1190 (Del. 2024).

10

bounds of reason in light of the circumstances, or so ignored recognized rules of law or practice [] as to produce injustice."[25]

III

The gist of Stevens's argument on appeal mirrors the argument in his new-trial motion. He contends that this Court's decision in *McConnell* creates a "bright-line rule"[26] that, before toxicology results may be introduced at trial, the State must "present the certifications of the State Chemist that the intoxilyzer machine was operating accurately before and after testing the breath of the defendant on trial."[27] This rule, according to Stevens, applies equally in the context of LC-MS/MS blood tests.

A

We have held that, "[w]hen . . . evidence is obtained from the use of a scientific instrument, expert testimony is necessary to establish the reliability and accuracy of the instrument."[28] Here, the State called three expert witnesses, analytical chemists Matthew Fox and Shronda Ellis, and Chief Forensic Toxicologist Jessica Smith, to testify about the reliability of the LC-MS/MS machines used to test Stevens's blood. Stevens does not contend that the State's

---

[25] *Id.* (quoting *Chaverri v. Dole Food Co.*, 245 A.3d 927, 935 (Del. 2021)) (internal quotation marks omitted).

[26] Opening Br. at 11–12.

[27] *Id.* at 11 (quoting *McConnell*, 1994 WL 43751, at *1).

[28] *Tolson v. State*, 900 A.2d 639, 645 (Del. 2006).

11

witnesses lacked the qualifications to testify about the reliability of the LC-MS/MS machines. He instead contends that the content of these witnesses' testimony was itself legally insufficient. The State should have, according to Stevens, introduced certifications of the State Chemist or other calibration data showing that the machines were operating accurately instead of presenting "inadequate and unnecessary"[29] testimony concerning the machines' calibration. We disagree with Stevens's assertion that the State's foundation testimony was insufficient.

Central to Stevens's argument is his contention that *McConnell v. State* provides a bright-line rule that calibration data must be produced before LC-MS/MS test results are admissible. But *McConnell* is readily distinguishable. In that case, as we have mentioned, the defendant challenged the introduction of intoxilyzer test results. McConnell's argument was that, although the State presented the required certification from the State Chemist that the machine was operating accurately before and after it was used to take a sample of McConnell's breath, the State was also required to show that the "standard solutions" used to calibrate the intoxilyzer machine by the State Chemist had been checked to determine their validity.[30] We held that, absent a showing from McConnell that the calibration checks were improper, there was a "presumption that the State Chemist acted carefully and in a

---

[29] Opening Br. at 14.
[30] *McConnell*, 1994 WL 43751, at *1.

prudent manner."[31]  In light of this presumption, we held that the trial court in that case did not abuse its discretion when it admitted the results of McConnell's intoxilyzer test into evidence.

Intoxilyzer breath tests are administered in the field or at police stations by police officers.  To ensure that each intoxilyzer in use in Delaware is operating accurately, each machine is calibrated periodically.  The Superior Court helpfully explained this process in *Cedeno v. State*:

> Those with some familiarity with the law of DUI in Delaware . . . know that in order to satisfy the foundational requirements of scientific validity of the BAC results as recorded by the Intoxilyzer, Delaware case law requires that the State produce a "Certification Sheet" prepared by the State Chemist, certifying that on dates prior to and after the subject test, the machine was operating properly.
>
> The Certification Sheet for each Intoxilyzer in service in Delaware is checked for calibration by the State Chemist periodically. The State Chemist runs known samples of .05 and .10 through the machine and records how close the machine reading is to the known sample. These readings, along with the date and time they are taken, are recorded on the Certification Sheet. In addition, the Chemist breath[es] into the machine and records the Chemist's own result (hopefully zero).[32]

That our law requires the production of a certification sheet from the State Chemist before intoxilyzer breath test results may be admitted is intuitive.  These machines are tools operated by police officers, not by the trained scientists who

---

[31] *Id.*

[32] *Cedeno v. State*, 2023 WL 6323598, at *2 (Del. Super. Ct. Sep. 27, 2023).

13

perform the calibration and certification of each machine. And at trial, testimony supporting intoxilyzer results often comes from the police officer that administered the test. It goes without saying that such police witnesses are not experts, as defined by D.R.E. 702, who may testify as to the reliability of the device they were using to conduct a breath test. Requiring a certification sheet from the State Chemist, the contents of which are generally admissible without the need of live testimony from the State Chemist through the business-records hearsay exception,[33] provides a check to ensure that the results generated from the machine used to analyze a defendant's breath sample are reliable.

LC-MS/MS blood intoxicant test results are different. These tests are conducted in State laboratories by forensic chemists. These individuals are trained experts who, unlike police officers using intoxilyzers, have knowledge of and perform the calibration and maintenance of LC-MS/MS machines. Stevens's argument that, in addition to testimony from analytical chemists at the Division of Forensic Services and the Chief Forensic Toxicologist that the LC-MS/MS machines used were properly calibrated, the State must also provide the analog of certification sheets from the State Chemist for these machines—such as the witnesses' bench notes—fails to recognize this distinction. It seems unnecessary, where there is a qualified expert witness on the stand who can opine on the subject of the reliability

---

[33] *See, e.g.*, *Best v. State*, 328 A.2d 141 (Del. 1974).

14

of their laboratory equipment, that an additional hearsay document on which the expert testimony is based be a foundational requirement. And as we mentioned earlier, Stevens makes no argument that the State's expert witnesses lacked the knowledge and qualifications necessary to opine on the reliability of the toxicology results.

In his reply brief, Stevens contends that the distinction between lay-witness police-officer testimony and expert-analytical-chemist testimony is "anachronistic"[34] because police officers are now routinely offered as expert witnesses. But Stevens provides no authority showing that police officers may be offered as expert witnesses to testify about the calibration of intoxilyzer machines in the same way that an analytical chemist might testify about the calibration of laboratory machines.

Both cases cited by Stevens are unpersuasive. In *Mooney v. Shahan*,[35] the Superior Court noted that a police officer may be qualified as an expert with specialized knowledge and training in administering nystagmus tests.[36] Although the court, reviewing a decision of the Court of Common Pleas, did also permit police officer testimony that "a permanently implanted false tooth would not skew

---

[34] Reply Br. at 9.
[35] 2001 WL 1079040 (Del. Super. Ct. Aug. 4, 2021).
[36] *Id.* at *3.

15

intoxilyzer results[,]"[37] it clarified that this testimony arose in the context of an administrative hearing at the Division of Motor Vehicles. The Superior Court did not analyze the police officer's testimony under the rules of evidence because "[a]dministrative hearings are not constrained by the rigid evidentiary rules which govern jury trials."[38] Even so, the court held explicitly that the police officer in that case "was not testifying as an expert."[39] And in *State v. Bell*,[40] the State offered a police officer as an expert witness on the *administration* of intoxilyzer tests. The Court of Common Pleas excluded the breath test evidence in that case for the State's failure to show that the police officer in question was qualified to administer intoxilyzer tests.[41] The calibration evidence in *Bell*, on the other hand, was provided by the State Chemist.[42]

The extent of foundation testimony necessary to admit the results of laboratory tests such as LC-MS/MS into evidence was not at issue in *McConnell*. To the extent *McConnell* is applicable, it stands for the proposition, as the Superior Court noted, that when there is evidence from an expert witness such as the State Chemist, an analytical chemist, or the Chief Forensic Toxicologist showing that a machine used for scientific testing was calibrated, absent a showing to the contrary

---

[37] *Id.* at *4.
[38] *Id.*
[39] *Id.*
[40] 2015 WL 1880591 (Del. Com. Pl. Apr. 23, 2015).
[41] *Id.* at *2.
[42] *Id.* at *2, *3 n.9.

by the defendant, we presume that such calibration was done "carefully and in a prudent manner."[43]

B

To be sure, under Rule 702, "the trial judge must make a preliminary determination that the expert witness is able, as a factual matter, to provide the proposed opinion."[44] This means that the trial judge, as Stevens correctly contends, must be satisfied that expert testimony is "based on sufficient facts or data."[45] But those facts and data need not be admissible.

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.[46]

Although the calibration data at issue here might in fact be admissible, the fact that D.R.E. 703 permits an expert to testify based on that data without its admission is fatal to Stevens's argument that the introduction of the calibration data itself is a foundational requirement for the introduction of LC-MS/MS results. The trial judge heard testimony from three witnesses concerning the calibration of the LC-MS/MS

---

[43] *McConnell*, 1994 WL 43751, at *1.
[44] *Perry v. Berkley*, 996 A.2d 1262, 1270 (Del. 2010).
[45] D.R.E. 702. Though Stevens does not cite Rule 702 in his opening brief, his argument appears to take aim at the admissibility of the experts' calibration testimony for failure to satisfy the second of Rule 702's requirements—that an expert's testimony be based on sufficient facts or data. Reply Br. at 5.
[46] D.R.E. 703.

17

machines. All three, basing their opinions on observations of either calibration data or the results returned by "neat" samples as permitted by the rules of evidence, testified that the machines were operating properly.

Stevens had numerous tools at his disposal to attack the State's toxicology evidence if, in fact, the calibration of the LC-MS/MS machines was faulty. Under Superior Court Criminal Rule 16(b)(1)(F), the State is required to permit a defendant to inspect "any results or reports of . . . scientific tests or experiments . . . that are material to the preparation of the defense." This rule plainly encompasses calibration data for the LC-MS/MS machines, but the record does not show that Stevens ever took advantage of this discovery tool.[47] In fact, two witnesses stated that they had physical copies of documents containing LC-MS/MS calibration data or similar test results with them in the courtroom, but Stevens did not request it.[48] D.R.E. 705(b) also permits a defendant to object to testimony by an expert witness on the grounds that the expert lacks a sufficient basis for expressing an opinion and

---

[47] The record does show that the State provided to Stevens the toxicology results, CVs of each expert witness, and chain of custody documentation for Stevens's blood sample. Letter from James Betts, Esq. to Defense Counsel, *State v. Stevens*, No. 2212008180 (Del. Super. Ct. Feb. 23, 2023) (Dkt. 4). During the sidebar conference to discuss Stevens's initial objection to the toxicology evidence, Stevens claimed to have made a broad discovery request under Superior Court Criminal Rule 16. The trial judge noted, however, that there was no specific request for bench notes or calibration data. App. to Opening Br. at A153–54. Nor does the record show that there was any discovery dispute before trial. The trial judge also gave Stevens the opportunity to raise the issue again post-trial if Stevens believed that there had been a "miscarriage of justice." *Id.* at A154. Stevens did not do so.

[48] App. to Opening Br. at A185, A202.

18

"conduct a *voir dire* examination directed to the underlying facts or data on which the opinion is based." Complementing D.R.E. 705(b), Superior Court Criminal Rule 16(b)(1)(G) requires the State to disclose, upon request from the defendant, "any evidence which the State may present at trial under [D.R.E.] 702, 703, or 705." Stevens did not take advantage of these tools either.

In his reply brief, Stevens raises for the first time the argument that this court should follow *United States v. Sheppard*,[49] an unreported case from a federal district court in Kentucky. This argument is waived.[50] In any case, *Sheppard* is distinguishable. In *Sheppard*, the trial judge excluded toxicology evidence where the defendant had requested, but the government was unable to provide, calibration data showing that the machines used to conduct a blood test of samples from victims harmed by drugs allegedly supplied by the defendant were operating accurately. The *Sheppard* court excluded the toxicology evidence because the calibration data was unavailable altogether, so the testimony through which the government sought to show that the testing was reliable consisted only of descriptions of the lab's standard practices.[51] Here, by contrast, the State's witnesses testified in reliance on actual

---

[49] 2021 WL 1700356 (W.D. Ky. Apr. 29, 2021).
[50] *See* Supr. Ct. R. 14(b)(vi)(A)(3).
[51] *Sheppard*, 2021 WL 1700356, at *5 ("Simply, [the expert's] reliance on [the lab's] standard procedures is not enough to establish, by a preponderance of the evidence, that the . . . testing was done properly.").

19

calibration data concerning the machines and tests at issue—data that was available and could have been obtained by the defense.

To sum up, *McConnell* provides no bright-line rule that a certification sheet from the State Chemist or other calibration data must be produced before blood-intoxicant test results from LC-MS/MS machines may be admitted into evidence. Nor do our established rules of evidence.[52]  In light of the fact that the court heard extensive testimony from expert witnesses based on their observations of the calibration data indicating that the machines were properly calibrated, and that Stevens presented no evidence showing that this testimony was not based on sufficient facts and data, we conclude that the Superior Court did not abuse its discretion in admitting that testimony and the LC-MS/MS results contained within it.

---

[52] Even if our rules of evidence suggested otherwise, the General Assembly has supplemented these rules in DUI cases.  The toxicology evidence may well have been introduced under 21 *Del. C.* § 4177(h)(1), which provides that

> [f]or the purpose of introducing evidence of a person's alcohol concentration or the presence or concentration of any drug pursuant to this section, a report signed by the Forensic Toxicologist, Forensic Chemist or State Police Forensic Analytical Chemist who performed the test or  tests as to its nature is prima facie evidence, without the necessity of the [expert witness] personally appearing in court.

So long as the report meets certain criteria as defined in the statute, the toxicology results contained within are prima facie evidence of intoxication—subject to challenge by the defendant.  Because we determine that the State's toxicology evidence was admissible under the traditional rules of evidence, we do not address its introduction under this alternative route.

## IV

For the foregoing reasons, we affirm Stevens's convictions.